**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **JAMES R. RODGERS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 15-CV-129-CVE-PJC** |
| | ) | |
| **BEECHCRAFT CORPORATION,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**REPORT AND RECOMMENDATION**

Defendants' Motion to Limit and/or Exclude the Testimony of Michael

Haider [Dkt. No. 60], has been referred to the undersigned United States

Magistrate Judge for Report and Recommendation.  [Dkt. No. 61].  The parties

have provided extensive briefing and documentation in support of their

positions and the Court conducted a two-day hearing on this and other expert

motions on September 7-8, 2016.  I **RECOMMEND** that the Defendants' Motion

be **GRANTED IN PART AND DENIED IN PART**, and that Haider's trial

testimony be limited as set forth in Section IV below.

**I**
**BACKGROUND**

This lawsuit arises from the March 17, 2013, crash of a Beech Premier

390 aircraft en route from Tulsa, Oklahoma, to South Bend, Indiana.  The

plane was piloted by Wesley Caves and carried passengers Steve Davis, James

Rodgers and Christopher Evans.  On approach to South Bend, the aircraft

experienced an inflight emergency created by the accidental shutdown of both

1

engines.  The pilot attempted to land at the South Bend Airport, but was advised by Air Traffic Control that the plane's main landing gear was not extended and that Caves should exercise a standard "go around" to evaluate his landing gear extension options and make another attempt.  Caves again made a second unsuccessful attempt to land, and the plane crashed just south of the South Bend airport.  Caves and Davis were killed.  Passengers Rodgers and Evans were seriously injured.

In this case, the surviving passengers assert claims of negligence against Beechcraft Corporation ("Beechcraft") and Hawker Beechcraft Global Customer Support, LLC ("HGCS") and a products liability claim against Beechcraft.[1] Their spouses, Sheryll Rodgers and Jill Evans, assert claims of loss of consortium against both defendants.  Plaintiffs seek compensatory and punitive damages.  The motion before the Court is Defendants' Motion to Limit or Exclude the testimony of Plaintiff's expert witness Michael Haider ("Haider"). It is, in effect, a *Daubert* motion challenging the sufficiency of Haider's methodology and the data underlying his conclusions.

## II
## APPLICABLE LEGAL PRINCIPLES

The Federal Rule of Evidence set parameters for the use of expert testimony:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:

---

[1]    On May 31, 2016, a companion case, *Caves et al. v. Beechcraft Corp., et al.*, No. 15-CV-125-CVE-PJC, was dismissed without prejudice.

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

When a party challenges an expert's testimony, the trial court must assess the validity of the testimony under the standards set forth in *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993). The application of those standards was explained and expanded in subsequent cases. Most notably, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court made clear that the holding of *Daubert* is not confined to scientific expertise, but also applies where an expert relies "on skill- or experience-based observation." *Id.* at 151. Whether the factors and standards enunciated in *Daubert* are reasonable measures of reliability" in a specific case, is a matter left to the discretion of the trial court. *Id.* at 153.

Under Fed.R.Evid. 702, the trial court "must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *U.S. v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)). *Daubert/Kumho* provides a framework for the court's task. As this Court explained in *City of Tulsa v. Tyson Foods, Inc.*, 2003 WL 26098561 (N.D.Okla. March 13, 2003):

> *Daubert* requires that the district court undertake an inquiry into the reliability of scientific evidence under Federal Rules of Evidence 702 and 703 to determine its scientific validity. *See Daubert*, 509 U.S. at 589–90. Rule 702 provides that, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" an expert "may testify thereto...." Fed.R.Evid. 702.

*Id.* at *1.

*Daubert* makes clear that the trial judge serves as a "gatekeeper" in assessing the validity of expert testimony. Thus, admissibility under Rule 702 is governed by Rule 104(e), which requires the judge to conduct preliminary fact-finding, and make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientific. To qualify as scientific evidence, the "[p]roposed testimony must be supported by appropriate validation ..." *Daubert*, 509 U.S. at 590. "[T]he requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* Evidentiary reliability is based upon the scientific validity of the expert's opinion.

Four nonexclusive, non-dispositive factors guide trial courts in their *Daubert* assessments of the reliability of the methodology for proffered expert testimony: (1) whether the opinion at issue can be tested; (2) whether it has been peer-reviewed; (3) the rate of known or potential error; and (4) general acceptance within the scientific community. Fed.R.Evid. 702. *U.S. v. Slough*, 22 F.Supp.3d 25 (D.D.C. 2014). Additionally, the expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. The Rule assigns to the trial court the task of ensuring that

an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Fed.R.Evid. 702; *U.S. v. Conagra Grocery Prods. Co., LLC*, 4 F.Supp.3d 243, 78 (D.Me. 2014).

To determine whether an expert's opinion is admissible, the district court must undertake a two-step analysis; first, the court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion, and second, the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology. Fed.R.Evid. 702, *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015).

This Court must consider the "fit" of the expert testimony to the issues in the case and the facts surrounding the case.  Included in such a consideration is the purpose for which the expert testimony is being presented.  "[S]cientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591.  "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92.

Rule 702(b) requires the expert's opinion to be based on "sufficient facts and data." However, in fulfilling its gatekeeper function, the court assesses only the sufficiency, not the quality, of the underlying data supporting an expert's opinion.  *See*, *U.S. v. Lauder*, 409 F.3d 1254, 1264 (10th Cir. 2005) ("[b]y its terms, the *Daubert* opinion applies only to the *qualifications of an expert and the methodology or reasoning used* to render an expert opinion" and "generally

does not, however, regulate the underlying facts or data that an expert relies on when forming her opinion.") (emphasis added).  In assessing the sufficiency of the facts, the trial court should conduct "a quantitative rather than qualitative analysis." Fed.R.Evid. 702 Advisory Committee Note to 2000 Amendments.  As another district court has held, "the Court does not examine whether the facts obtained by the witness are themselves reliable – whether the facts used are qualitatively reliable is a question of the *weight* to be given the opinion by the factfinder, not the *admissibility* of the opinion." *U.S. v. Crabbe*, 556 F.Supp.2d 1217, 1223 (D.Colo. 2008) (emphasis in original). Accordingly, the trial court should limit its inquiry under Rule 702(b) to "whether the witness obtained the amount of data that the methodology itself demands." *Id.*

There are additional obligations imposed upon an expert witness by the Federal Rules of Civil Procedure.  Generally, an expert witness must provide a written report setting forth his opinions and the bases for them:

> Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> > (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> >
> > (ii) the facts or data considered by the witness in forming them;
> >
> > (iii) any exhibits that will be used to summarize or support them;
> >
> > (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed.R.Civ.P. 26(a)(2)(B).

The expert's report cannot be "ghost-written" by counsel or prepared without prior substantive input from the witness. *Trigon Ins. Co. v. U.S.*, 204 F.R.D. 277, 293 (E.D.Va. 2001). "Preparation implies involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement." *Manning v. Crockett*, 1999 WL 342715, at *2-3 (N.D.Ill. May 18, 1999).

## III
## DISCUSSION

As a preliminary matter, the Court addresses the fundamental question of whether Haider actually "prepared" his expert report, or whether it was "ghost-written" for him by counsel. Defendants raised this issue in passing in their motion, *see*, Dkt. No. 60, at 3, before expanding on the question in their Reply brief, [Dkt. No. 140, pp. 1-3]. Thus, Plaintiffs have not been afforded a fair opportunity to address the issue. Nevertheless, because the record evidence indicates a serious question of proper adherence to the requirements of Rule 26, I have spotlighted the matter for the benefit of litigants generally and the District Court specifically.

Rule 26 requires that where an expert report is required, the report must be "**prepared and signed** by the witness." Fed.R.Civ.P. 26(a)(2)(B) (emphasis

added).  The report must set forth all of the witness' opinions and the bases for those opinions.  Fed.R.Civ.P. 26(a)(2)(B)(i)-(vi).

Here, it is undisputed that attorney Fred Stoops wrote the expert report for Haider.  In his deposition, Haider admitted that he did not author his expert report.  It was written by counsel and presented to Haider for his approval.

> Q:  Were you the author of the report?
> A:  No.
> Q:  Who was the author of the report?
> A:  Mr. Stoops.
> Q:  How did he communicate to you or send you the report to sign?
> A:  I was sent the report on email, and we discussed it line by line and made some changes.  His paralegal, I believe, made the changes for me and sent it back to me, and I signed it.

[Dkt. No. 60-4, p. 49].[2]

Pressed further, Haider stated that he only made one change to the report.

> Q:  Do you recall what changes you made?
> A:  No.  Well –
> Q:  Did you –
> A:  -- I recall one specifically, that the initial report provided to me said that the checklist had a procedure to restart both engines in flight, if they're both gone, and there is no such checklist.
> Q:  Is that the only change that you recall making from what Mr. Stoops sent you?
> A:  Yes.
> Q:  I – I just want to make sure I understand.  He wrote the report, and the only thing you changed was the statement that there was a checklist for a dual-engine failure?
> A:  Yes.

[*Id.*, p. 50-51].

---

[2]  Initially, Haider said he "wrote" the expert report sometime in February 2016.  [Dkt. No. 60-4, p. 25].  However, he later admitted he had not "authored" the report and that it was authored by Plaintiffs' counsel Fred Stoops.  [*Id.*, p. 49-50].

Rule 26 does not preclude attorneys from assisting in drafting an expert's report.  An attorney may have good reason to assist an expert in the preparation of his report.  An attorney will have far greater familiarity with the details of Rule 26 and can ensure that the expert witness does not run afoul of its requirements.  *See*, *Marek v. Moore*, 171 F.R.D. 298, 301 (D.Kan. 1997). Recognizing this, the court in *Manning* offered guidance on what was permissible and not permissible:

> [A]n attorney's assistance with the preparation of documents required by Rule 26, such as a list of cases in which the expert has testified, or fine-tuning a disclosure with the expert's input to ensure that it complies with the rules is permissible.
>
> In contrast, preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it conflicts with Rule 26(a)(2)(B)'s requirement that the expert "prepare" the report.

*Manning*, *supra*, at *3.

Here, it appears that counsel did far more than merely "fine-tune" Haider's opinions to ensure compliance with Rule 26.  The expert cannot be a mere conduit for the opinion of the attorney or others.  See, Advisory Committee Note to 1993 Amendment to Rule 26, Paragraph (2) (expert report should be written in a manner that reflects the testimony to be given by the witness.).  Therefore, it is improper for an attorney to prepare the expert's opinions for him and then have the expert sign the drafted report as his own. *Skycam, Inc. v. Bennett*, 2011 WL 2551188, *6 (N.D.Okla. June 27, 2011). "[P]reparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it conflicts with Rule 26(a)(2)(B)'s

requirement that the expert "prepare" the report." *Trigon*, 204 F.R.D. at 293 (*citing Manning*, 1999 WL 342715, at *2-3).  Preparation of an expert report means more than simply putting one's name on a report prepared by someone else.  *Manning*, at *3.  "[T]he assistance of counsel contemplated by Rule 26(a)(2)(B) is not synonymous with ghost-writing."  *Id.*  The court noted: "Allowing an expert to sign a report drafted entirely by counsel without prior substantive input from an expert would read the word 'prepared' completely out of the rule."  *Id.*

Courts have dealt with this situation in different ways.  In *Marek*, an expert witness submitted a report to counsel who assisted in making authorized revisions.  *Marek*, 171 F.R.D. at 299.  The court found that this did not violate Rule 26.

In *Indiana Ins. Co. v. Hussey Seating Co.*, 176 F.R.D. 291 (S.D.Ind. 1997), an expert witness testified at deposition that the plaintiff's lawyers had prepared his Rule 26 report.  The expert went on to explain, however, that he had "personally prepared the nine opinion reports" contained therein. Furthermore, other documents attached to the Report were the expert's work papers or his summary of his qualifications.  *Id.* at 292-93.  While finding compliance with Rule 26 to "non-chalant, if not half-hearted," *id.* at 293, the court found that the assistance of the attorneys fell within the acceptable limits of the Rule.

Where a court finds that an expert has merely adopted opinions of the attorney without applying any expert analysis of underlying facts or

information, the court may properly disregard, discount or strike that expert's

testimony.

> The weight accorded to an expert's opinion must vary in
> accordance with the expert's competence and knowledge; an expert
> who can be shown to have adopted the attorney's opinion as his
> own stands less tall before the jury than an expert who has
> engaged in painstaking inquiry and analysis before arriving at an
> opinion.

*Occulto v. Adamar of N.J., Inc.,* 125 F.R.D. 611, 616 (D.N.J. 1989).

Courts have held that where an attorney writes the report for the expert,

even where the expert reviews and adopts it, this does not comport with Rule

26.  In *C. Baxter Int'l., Inc. v. McGaw, Inc.*, 1996 WL 145778, (N.D.Ill. 1996),

*aff'd in part and rev'd in part on other grounds*, 149 F.3d 1321 (Fed.Cir. 1998)

(court expressly disregarded the testimony of plaintiffs' legal expert because he

"did not independently prepare his expert report, allowing himself to be a

'mouthpiece' for plaintiffs' attorneys." *Id.* at *4.  In *Marbled Murrelet v. Pac.*

*Lumber Co.*, 880 F.Supp. 1343 (N.D.Cal. 1995), *aff'd*, 83 F.3d 1060 (9th Cir.

1996), the court rejected the testimony of an expert witness whose testimony

aligned exactly with a declaration proposed by counsel.  The court found that

the experts' testimony "lack[ed] objectivity and credibility."  *Id.* at 1365.

In *Occulto, supra*, an attorney drafted an expert's report which the

expert adopted verbatim.  There was one important difference between the

attorney's draft report and the expert's adopted report:  On the top of the

attorney's report was the legend: "PLEASE HAVE RE-TYPED ON YOUR OWN

STATIONERY.  THANK YOU."  *Occulto*, 125 F.R.D. at 613.  The defendant

moved to compel production of the attorney's draft expert report sent to the expert as well as a damning cover letter.  The court rejected claims of privilege and work product and ordered the original draft and the cover letter produced to the other side to be used in cross-examination.  *Id.* at 617.

In *Clintec Nutrition Co. v. Baxa Corp.*, 1998 WL 560284 (N.D.Ill. Aug. 26, 1998), the expert admitted he did not prepare the first draft of his report, but that he drafted the final version with assistance of counsel.  *Id.* at *6.  The court opted not to preclude the expert from testifying, finding:  "These facts call into question the independence of Mr. Eilers' report and his credibility as an expert.  These facts may be brought out on cross-examination."  *Id.*

In *In re Jackson Natl Life Ins. Co. Premium Litig.*, 1999 U.S. Dist. LEXIS 17153 (W.D.Mich. Sept. 29, 1999), the court struck an expert's report under Fed.R.Civ.P. 37(c)(1) because the report was authored by plaintiffs' counsel and, therefore, was not "prepared" by the expert and, therefore, violated Rule 26(a)(2).

Here, the undersigned has grave concerns about the way Haider's report was prepared.  However, because of the manner in which the issue was presented to the Court, Plaintiffs have not had a fair opportunity to respond, and the record is not clear as to the extent of Haider's personal involvement in the report's preparation.  Defendants have not met their burden on this issue.  *Trigon*, 204 F.R.D. at 295.  Accordingly, I make **NO RECOMMENDATION** as to whether Haider's report meets the "prepared and signed" requirements of Rule

26 in this regard.[3]  If the District Court wishes to more fully address the question, it may want to conduct a further evidentiary hearing.

Below I offer an analysis of Haider's opinions and proposed expert testimony in accordance with the  Court's gatekeeper function under *Daubert* and *Kumho.*

## A. Haider's Qualifications

Fed.R.Evid. 702 permits expert testimony by one who is qualified by "knowledge, skill, experience, training, or education."  Plaintiffs offer Haider as an expert based on his training and experience in aviation.  Haider has educational expertise in aviation.  He holds a B.S. degree in aerospace engineering from the U.S. Military Academy, West Point.[4]  [Dkt. No. 60-7, Exh. "A"].  He is a graduate of the U.S. Naval Test Pilot School.  Haider also has significant experience flying helicopters and fixed wing planes.  He was an Army aviation officer from 1985 to 2006.  [*Id.*].  He has nearly 7,000 hours of flight experience, including time flying a Beechcraft Premier jet like the one at issue in this case.  [*Id.*].  He is instrument-rated on both helicopters and airplanes, and holds a commercial pilot's rating as well.  [*Id.*].  He received his Airline Transport Pilot's certificate in single-engine land, helicopter, and multi-

---

[3]     The question becomes even more concerning when one considers the paucity of support for Haider's various opinions, as reflected in his deposition testimony.  This emphasizes the Court's concerns over the independence of Haider's views, *e.g.*, *Clintec, supra,* at *6, *C. Baxter Int'l, supra,* at *4, as well as the reliability of his conclusions and the sufficiency of underlying data.

[4]     Haider also has a Master's degree in Procurement, Acquisition and Business Management from Webster University, St. Louis.  [Dkt. No. 60-7, Exh. "A"].

engine land.  [*Id.*, at 56-57].  He was Base Chief Pilot for a Premier IA Jet from 2006-07. [*Id.*].

He has not testified as an expert in any other cases.

To determine whether a proposed expert's testimony is admissible, the court must first decide whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion.  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).  The witness' expertise must be adequate both in a general sense and with regard to the specific opinion he or she proposes to address as an expert.  *In re Williams Sec. Litig.*, 496 F.Supp.2d 1195, 1232 (N.D.Okla. 2007).  Defendants contend that Haider is unqualified to offer specific opinions about design defects, negligence or causation.

"The issue with respect to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."  *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994), *cert. denied*, 513 U.S. 1111 (1995).  *See also*, *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) ("[W]e agree with the district court that Dr. Curtis ... easily qualifies as an expert under Federal Rule of Evidence 702.  The real question is, what is he an expert about?").  I conclude that Haider has general expertise in aviation-related matters, specifically drawing on his extensive knowledge and experience as a pilot.  However, either because he lacks specific expertise on a topic or because he gathered no data or information to support his

conclusions, he should not be permitted to testify on such issues as: defects in the airplane's design [Dkt. No. 60-4, pp. 64-65], whether Hawker Beechcraft was negligent in its servicing of the plane, the cause of the crash [Dkt. No. 60-7, p. 7], or problems with the plane's electrical components [Dkt. No. 60-4, pp. 148-49 (testifying that John Bloomfield was the expert on the electrical components)].

Haider admitted at his deposition that he is not a metallurgist [Dkt. No. 60-4, at 40], not a "human factors expert" [*Id.*, at 44], not an A&P mechanic [*Id.*, at 45], not an expert in airplane design or in landing gear design [*Id.*, at 65].  Thus, he lacks the expertise to offer specialized expert opinions on these topics as well.

### B. Haider's Opinions

In the Response to Defendants' Motion to Limit/Exclude Haider's testimony, Haider is described as "Plaintiff's piloting expert witness," specifically for the purpose of rebutting the expert testimony of Defendants' expert, Robert "Hoot" Gibson.  [Dkt. No. 118, at 1].  However, Haider's proposed testimony goes well beyond piloting issues, and includes numerous opinions for which he testified he had no support.  His expert report lists some 22 opinions on eight different subjects.  Plaintiffs argue that Haider should be allowed to offer opinions as to the cause of the crash [Dkt. No. 118, at 4], including electrical defects [*Id.*, at 6], alternate landing gear design [*Id.*, at 9], Hawker Beechcraft's maintenance of the plane [*Id.*, at 14], analysis of Caves' voice showing that he was calm during the in-flight emergency [*Id.*, at 15],

adequacy of Caves' flight training [*Id.*, at 16], whether Caves properly followed various checklists and acted as a "reasonably prudent pilot" [*Id.*, at 18].

Haider submitted an expert report[5] [Dkt. No. 60-5] and, later, a Revised Expert Report [Dkt. No. 60-7].[6]  He was deposed on April 21, 2016.  [Dkt. No. 60-4].  In support of Plaintiffs' Response to this motion, Haider also submitted a three-page Affidavit in which he espoused additional opinions.[7]  [Dkt. No. 118-3].

### C. The Bases for Haider's Opinions

Under Rule 702, an expert with the necessary qualifications in the relevant field may give expert testimony if (i) the testimony is based upon sufficient facts or data, (ii) the testimony is the product of reliable principles and methods, and (iii) the witness has applied the principles and methods reliably to the facts of the case. Rule 702, Fed.R.Evid. *In re Williams Sec. Litig.*, 496 F.Supp.2d 1195, 1233 (N.D.Okla. 2007) (*citing*, *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003)).  The inquiry into the sufficiency of the facts or data supporting an expert's opinion is designed to determine whether sufficient underlying data supports the opinion.  It is not meant to evaluate the quality of the data.  That is a matter for cross-examination at trial.  *Daubert*, 509 U.S. at 596.  Consequently, the court's

---

[5]     Neither the Expert Report nor the Revised Expert Report are dated, but Haider testified he completed his initial report in February 1, 2016, and an amended report in mid-April 2016.

[7]     On September 20, 2016, I recommended that Haider's "supplemental" report/Affidavit be stricken except for his opinions regarding the alleged defect in the Airplane Flight Manual with respect to restarting the plane's engines in-flight.  [Dkt. Nos. 182 & 183].

"focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004).

Haider testified that on January 30 or 31, 2016, he received materials to review for his report. [Dkt. No. 60-4, p. 26]. These materials included CDs [*Id.*], eight DVDs [*Id.*, p. 30], witness depositions [*Id.*, p. 31-33] and other experts' reports [*Id.*, pp. 33-36]. By the Court's count, more than 10,000 pages of material were included on just the eight discs sent to Haider. [*Id.*, pp. 2-4]. A number of depositions were not available when his report was prepared. [*Id.*, at 31]. In addition, other depositions – some critical of Caves' abilities as a pilot, were not provided to Haider. [*Id.*, at 78-82]. His initial report was completed within two days of receiving the materials.[8] [*Id.*, p. 27]. It was amended slightly in mid-April and the amended report was produced a few hours before his deposition on April 21. [*Id.*, pp. 34-35].

Defendants contend that Haider's testimony should be excluded or limited because his opinions are merely parroted from other experts or the attorneys. Plaintiffs argue that in forming his opinions, Haider may rely on facts or data developed or presented by other experts. [Dkt. No. 118, pp. 4-5]. Under Fed.R.Evid. 703, it is permissible for an expert to base opinions "on facts or data in the case that the expert has been made aware of or personally observed." As Plaintiffs point out, this allows an expert in one field to "rely on

---

[8]     The Court has serious doubts that Haider could possibly have conducted any meaningful review of the vast amount of material supplied to him on January 30 or 31 and be prepared to sign off on the expert report prepared by attorney Stoops by February 1.

the opinions of experts in other fields." Fed.R.Evid. 702, Advisory Committee

Notes to 2000 Amendments.  However, the Advisory Committee Note goes on to

say that such reliance on an expert in another field may be used as

"background material" for arriving at other independent opinions.  *Id.*  There is

no evidence that is what happened here.  Haider did no testing regarding the

Premier's electrical system, its landing gear system, problems with electrical

components, or the ultimate cause of the plane crash.  Instead, Haider largely

adopted as his own a list of opinions provided by counsel and other experts.

This is not proper.  First, the opinions are not reliable when they are the

product of blind acceptance.  Second, such opinions are of little assistance to

the trier of fact.  Third, there is no assurance that Haider *independently*

reached the opinions he has adopted.  As one court has noted:

> It is true that, ordinarily, an expert may rely on the opinions of
> another expert if they inform or contribute to his own independent
> opinions. [An expert] <u>may not simply parrot or recite the opinions
> and knowledge of other expert and fact witnesses</u>, however.

*Ash Grove Cement Co. v. Emp'rs Ins. Of Wausau*, 246 F.R.D. 656, 661

(D.Kan. 2007) (emphasis added).

Haider also proffers opinions based on his experience as a pilot.

This is a more acceptable area for Haider's testimony.

### D.  Haider's Methodology

Haider's opinions are offered based on his training and experience as a

pilot, not on the basis of scientific or technical methodology.  His opinions are

not the result of the application a discernible methodology to a universe of data

to arrive at expert conclusions.  This does not preclude Haider from testifying

as an expert.  Fed.R.Evid. 702 expressly permits expert testimony based on "skills, experience, training."  However, the Rule does preclude Haider from offering opinions which can only be arrived at through a scientific or technical methodology applied to specific information or data.  Just because a person is approved as an expert, does not mean they are permitted to offer any opinion related to the subject of their expertise.  *See*, *Ralston*, 275 F.3d at 967-68.

Therefore, Haider should be is limited to offering opinions based on his experience, skill and training as a pilot.  For this reason, in assessing the reliability of Haider's opinions, the four *Daubert* factors offer little help.  Haider followed no theory or technique that has been tested.  His methodology was not subject to peer review, there are no known or potential error rates to consider, and there is no evidence that any theory employed by Haider enjoys wide acceptance in the relevant scientific or technical community.  *Daubert*, 509 U.S. at 592-94.

Haider's deposition testimony makes it clear that he neither assembled a universe of data for analysis, nor employed a scientific or technical methodology to reach his many of his conclusions.  Haider should not be permitted to testify to scientific or technical opinions which are not the product of his own analysis and technical methodology.  To the extent that he is merely parroting the opinions of other experts, his testimony does not pass the requirements of *Daubert.*  Furthermore, such testimony would be duplicative of that offered by other expert witnesses.

A few examples highlight the problems with much of Haider's proposed testimony.

**(1) Caves' Flight Training**

Haider says that Caves received appropriate flight training from a company called Jetstream, and, in particular, learned the "proper procedures for using the alternate landing gear extension system." [Dkt. No. 60-7, pp. 4-5]. However, in his deposition, Haider admitted that he had no information upon which to base these opinions.

> Q:    Your first opinion is about the training options leading to the type-rated certification for the Model 390 and your opinion that Mr. Caves chose an acceptable program to receive his certification. What program did Mr. Caves choose?
> A:    I'm not certain without looking, but I believe it was out in California, called Jetstream, something like that.
> **Q:    What is your understanding of Jetstream's program?**
> **A:    I have no understanding of it.**
> **Q:    Did Jetstream have a flight simulator for a Premier?**
> **A:    I don't know.**
>                     *     *     *     *
> **Q:     Have you obtained any information on what Mr. Caves received in terms of training at Jetstream?**
> **A:    No.**

[Dkt. No. 60-4, pp. 76-79 (emphasis added)].

> Q:    When he was training at Jetstream, do you have any information that Mr. Caves was trained on how to handle a dual-engine failure, flameout, shutdown?
> A:    No.
> Q:    Do you have any information whether Mr. Caves was trained on how to deploy the alternate gear extension system while he was training at Jetstream?
> A:    No.
> **Q:    So as far as you know, he wasn't trained on how to deploy the alternate gear extension system, correct?**
> **A:    It would have to be part of the curriculum.**
> **Q:    Have you seen the curriculum at Jetstream?**
> **A:    I have not, no.**

> **Q:** **Have you talked to anybody at Jetstream to see if it was part of the curriculum?**
> **A:** **No.**
> **Q:** **So you're just assuming that he was trained?**
> **A:** **Yes.**

[*Id.*, pp. 82-83 (emphasis added)].

> **Q:** Do you know if Jetstream trained him on how to deploy the alternate gear extension system?
> **A:** I do not.
> **Q:** **So what is your basis for saying that he was trained, other than your assumption?**
> **A:** **None.**

[*Id.*, p. 84 (emphasis added)].

The Court concludes that Haider's opinions as to Caves' flight training and unreliable because they are not based on *any* factual information; accordingly, he should be precluded from offering any testimony on this topic. An expert, whether basing testimony upon professional studies or personal experience," must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.

**(2) Caves' prior training issues**

> **Q:** Did you know that prior to buying the Premier that he owned an Eclipse airplane?
> **A:** Yes.
> **Q:** Did you ever talk to his instructor in the Eclipse?
> **A:** No.
>
>            \*         \*           \*           \*
>
> **Q:** Do you recall ever being provided the deposition transcript of … Casey Jones,?
> **A:** No.
> **Q:** Were you aware that when Mr. Jones was flying with Mr. Caves in the Eclipse that Mr. Jones observed that Mr. Caves had difficulty following checklist?
> **A:** No.
> **Q:** Nobody ever told you that?

A:  No.

Q:  Don't you think that would be significant for you to know when you're rendering opinions about a pilot's capabilities?

A:  Yes.

Q:  Is that something you wish you had been provided?

A:  Yes.

Q:  Were you aware that during some of the flights that Mr. Jones experienced with Mr. Caves that he observed Mr. Caves would put the airplane, the Eclipse, in unstable positions?

A:  No.

Q:  Nobody ever told you that?

A:  Correct.

Q:  Is that some information that you wish you had been provided about his background and training?

A:  Yes.

Q:  Were you aware that Mr. Jones observed that Mr. Caves had, quote, switchology problems, end quote?

A:  No.

Q:  Were you aware that Mr. Jones observed that Mr. Caves would flip the wrong switches in the wrong order?

A:  No.

Q:  Were you aware that after several weeks of training of Mr. Caves that Mr. Jones told him, "You are not ready for a check ride"?

A:  No.

[Dkt. No. 60-4, pp. 77-80].

Haider did not gather sufficient information to render an opinion on Caves' training or abilities as a pilot.  This is not just a matter of the weight to be afforded Haider's opinion, it is a disqualifying event.  Haider's expertise is of no help to the trier of fact if he doesn't bother to assemble the information necessary for him to form a meaningful opinion.

**(3) Pilot Reliance on Functionality of the Plane**

With respect to his second group of opinions regarding a pilot's reliance

on the "functionality of an aircraft as designed," Haider again offered little or no

underlying information supporting the opinions in his report.

> Q:   What information do you have that Mr. Caves followed that
>       checklist after the generators spooled down?
> A:   The only information I had is that he got an engine started.
> Q:   Do you know how he got an engine started?
> A:   No.

[Dkt. No. 60-4, p. 101].

Haider had no information about whether Caves had the engine ignition

switches in the right position to restart the engines.

> Q:   What does the AFM [Airplane Flight manual] call for, in terms of
>       where to move – or where to have the ignition switch during any
>       attempted air start?
> A:   It calls for it to be on.
> Q:   What information do you have that before trying to start the engine
>       after Mr. Davis shut the engines off that the ignition switches –
>       there's two of them, right?
> A:   Yes.
> Q:   What information do you have that those ignition switches, either
>       one, was in the on position?
> A:   No information.

[*Id.*, pp. 102-03].

Regarding his opinion that the Premier jet experienced intermittent

electrical failure that compromised the functionality of the majority of the

electrical system and hydraulic components of the aircraft," Haider had no

supporting data.  In one of the most egregious examples of the cavalier manner

in which Haider espoused a critical expert opinion, Haider admitted that he

didn't write the opinion at issue and that he had no information to support it.

Q:      Your opinion in your report indicates that "… the subject aircraft
        experienced intermittent electrical system failure that
        compromised the functionality of the majority of the electrical
        system and hydraulic components of the aircraft."  Do you see
        that?

A:      Yes.

**Q:      Did you write that or did Mr. Stoops write that?**

**A:      Mr. Stoops.**

**Q:      What information do you have that this airplane was
        experiencing intermittent electrical system failures after these
        engines were shut off?**

**A:      None.**

Q:      Did you go to the scene of the accident?

A:      No.

Q:      Did you talk to the NTSB?

A:      No.

Q:      Have you inspected any of the components of this airplane?

A:      No.

Q:      Have you talked to any expert that claims that there was
        intermittent electrical system failures that caused Mr. Caves not to
        be able to recover the airplane after his copilot shut the engines
        off?

A:      No.

[*Id.*, pp. 115-16 (emphasis added)].

Haider opined that "Beechcraft failed to properly design and/or maintain

the emergency landing system in the subject aircraft, such that it failed to

extend the main landing gear," but admitted this opinion was based only on

assumption.

Q:      What is your basis for that?

A:      My basis for that is that the handle was pulled, and – I assume the
        handle was pulled, and the main gear didn't come down.

Q:      Well, did Mr. Caves pull the handle all the way back?

A:      I don't know.  But a reasonable person in this situation would have
        pulled it right out of the dashboard or the pedestal.

Q:      That's an assumption that you're making?

A:      It is.

[*Id.*, p. 128].

Except for a few limited opinions, Haider lacked sufficient information upon which to render opinions as to design or defects in the Premier Jet.  One of Haider's proffered opinions states:

> Although not optimal, if an aircraft is functioning properly, a pilot should be able to recover from the loss of both engines in flight by following a prescribed sequence.  Aircraft are designed and manufactured in a manner that allows the pilot to restart both engines in the event they shut down simultaneously in flight.

[Dkt. No. 60-5, p. 5].

This opinion is based solely on Haider's career as a well-trained, well-experienced, pilot.  That is a sufficient basis for his opinion as to the ability to restart engines during an in-flight emergency.  He should be permitted to offer this opinion.

### (4) Negligent Maintenance by Hawker Beechcraft

On occasion, Haider was guilty of the *post hoc ergo propter hoc* fallacy:

Q:    What information do you have that the Hawker Beechcraft Service Centers failed to ensure that the alternate landing gear system was operating properly?
A:    That it didn't work.

[*Id.*, p. 160].

When pressed on this issue, Haider admitted he had no factual basis for his opinion.

Q:    Who did the last annual on this airplane?
A:    I do not know.
Q:    Do you know if it was even a Hawker Beech facility?
A:    No.
Q:    Are you a mechanic?
A:    No.
Q:    Assuming you're correct that an annual inspection would call for the alternate gear extension system to be checked, what information do you have that it wasn't checked – and passed?

A:      Only that it failed to deploy.

[*Id.*, pp. 161-62].

Haider's expert report states that Beechcraft "failed to warn owners, operators and maintenance personnel of the significant pull force necessary to extend the alternate landing gear system." [Dkt. No. 60-7, p. 6].  At his deposition, Haider offered no factual basis for this opinion, other than what Plaintiffs' attorneys told him.

Q:      What is the basis for that opinion?
A:      On some exemplar aircraft, there were tests performed, and it was a significant amount of pull force above the advertised pull force.
Q:      [H]ow do you know that?
A:      I was told that by [attorney] Mr. LaCourse.
Q:      What did Mr. LaCourse tell you was the results obtained?
A:      He didn't say specifically.
Q:      Do you know how excessive it was?  If there is some standard, what was the test result?
A:      He seemed to indicate that it was at least 50 percent more than advertised.
Q:      Have you seen the video of that testing?
A:      Yes, but not completely.  I started watching them, and I – I ran out of time, so –
                    *          *          *          *
Q:      So you're relying upon what Mr. LaCourse told you?
A:      Yes.
Q:      Are you relying on anything else?
A:      No.

[Dkt. No. 60-4, pp. 135-36].

There is simply not sufficient information or data to support Haider's opinions in this regard.  *See*, *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (too great an "analytical gap" between data and opinions).  Just because Haider has aviation experience and piloting expertise, does not mean that he can offer any opinion on any topic as long as it involves a plane.  *See*, *Ralston*,

275 F.3d at 970.  *See also*, *Alexander v. Smith & Nephew, P.L.C.*, 98 F.Supp.2d 1310, 1315 (N.D.Okla. 2000) ("[t]he simple possession of a medical degree is insufficient to qualify a physician to testify as to the advantage of a spinal fixation device, the medical causation of spine-related ailments, or the mechanical functioning of an orthopedic implantation device.").

**(5) Hawker Beechcraft's failure to diagnose/repair electrical problems**

In addressing this issue, Haider adopted statements in another expert's report as the sole basis for his own opinions.  For example, Haider echoes an opinion offered by Plaintiffs' expert John Bloomfield that "[t]he significant number of failed electrical components during the short duration of the subject aircraft's life should have put Beechcraft on notice that there were systemic electrical problems with the aircraft."[9]  [Dkt. No. 60-7, p. 6].  Haider further opines that the Hawker Beechcraft Service Center "failed to properly diagnose and repair the jet, leaving it in an unairworthy condition."  [*Id.*].

> Q:    Do you have any information that this alleged defect in the pilot's essential bus caused electrical components to fail during the life of this airplane?
> A:    No.  I only surmise those from the other experts.
> Q:    Okay.  What other experts?
> A:    Mr. Bloomfield.

[Dkt. No. 60-4, p. 164].

"Surmise" – *i.e.*, making a judgment about something without sufficient evidence; to guess – is not a proper basis for expert testimony.  *Sanchez v.*

---

[9]    This opinion is based largely on Bloomfield's opinion regarding a number of failed electrical components on the subject plane.  *See*, Dkt. No. 52-6, pp. 36-38].

*KPMG Peat Marwick*, 1996 WL 104259, *2 (D.N.M. Jan. 5, 1996) ("An expert's opinion that is not based on sound methodology or that results from mere surmise or conjecture should be excluded.").

> Q:    When it comes to specifically describing any electrical problems on the plane, are you going to defer to Mr. Bloomfield?
> A:    I am.

[Dkt. No. 60-4, p. 194].

Haider was not even aware that the expert on whom he relied had altered some of his opinions that Haider had adopted.

> Q:    Well, what information do you have that any failures of any electrical components were related to some electrical issue on the pilot's essential bus?
> A:    Only the deposition of Mr. Bloomfield.
> Q:    You read that part of Mr. Bloomfield's deposition where he backed off several of his opinions right?
> A:    No.
> Q:    You didn't read it or he didn't back off?
> A:    I didn't read it.

[Dkt. No. 60-4, pp. 162-63].

Haider assembled no data regarding electrical issues on the subject aircraft and performed no testing of any data.  Haider did not visit the scene of the accident [Dkt. No. 60-4, p. 116], did not talk to the National Transportation Safety Board ("NTSB") [*id.*], did not examine any electrical components of the airplane [*id.*], and did not talk "to any expert that (sic) claims that there was (sic) intermittent electrical system failures that caused Mr. Caves not to be able to recover the airplane after his copilot shut the engines off" [*id.*].  This presents

a scenario where there is simply "too great an analytical gap between the data and the opinions proffered." *Joiner*, 522 U.S. at 146.

Haider admitted that his opinions on this topic were simply a reiteration of Bloomfield's opinions. [Dkt. No. 60-4, pp. 148-49, 194]. Haider's testimony would thus be duplicative of Bloomfield's. However, since he did not reach his opinions by use of any scientific or technical methodology, and since he assembled no data for analysis, Haider has no reliable basis for any of these opinions, and they must be excluded under Fed.R.Evid. 702. General expertise/experience in aviation does not permit Haider to offer opinions on *all* aircraft-related topics. *See*, *Ralston*, 275 F.3d at 967-68 ("[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue.").

### (6) Caves' actions as a 'reasonably prudent pilot'

Haider proffers a number of opinions concerning Caves' actions in piloting the Premier jet at issue. First, Haider's opinion that "From the time the engines shut down, Pilot Caves operated the aircraft as a reasonably prudent pilot under the circumstances," [Dkt. No. 60-7, p. 6], is improper. At least one court has held that such a determination is a factual matter that a jury could decide without special assistance from an expert. *See*, *Mata v. Circuit City Stores, Inc.*, 2008 WL 5622537, *2 (D.N.M. Oct. 28, 2008) (determination that state manager was reasonable and prudent in calling police was fact determination for jury). Similarly, a jury can determine whether Caves acted in a reasonable and prudent manner, without expert assistance.

Second, Haider's opinion that caves "properly followed the engine restart sequence" is not supported by sufficient data.  Haider admitted he did not know what steps Caves took to restart the plane's engines.

Third, Haider proposes two opinions predicated on other experts' conclusions that there were defects in the plane, particularly the electrical system and the lending gear. [*Id.*, p. 6-7].  These opinions should be permitted only if a proper foundation is presented at trial through the testimony of these other expert and necessary fact witnesses.[10]

### (7) Causation

Haider seeks to opine that the airplane crash "was caused by a series of aircraft system failures which rendered the Premier IA unairworthy and resulted in the accident on March 17, 2013." [Dkt. No. 60-7, p. 7].  Haider would testify that the electrical system on the plane suffered "intermittent electrical system failure" that compromised the "majority of the electrical system and hydraulic components" of the plane.  [*Id.*, at 5].  He also cites unspecified "defects relating to the landing gear" [*id.*, at 6] as a cause of the crash.

These are opinions espoused by other expert witnesses and counsel for Plaintiffs.  While Haider may rely on other experts, he may do so for

---

[10]    In their Response to the pending motion, Plaintiffs cite the depositions of Darrin Jones, Rodney Voth, Shawn Kohr and Rick Frie.  [Dkt. Nos. 118-5, 118-6, 118-8 & 118-12].  However, these depositions are not listed among the materials Haider considered in fashioning his expert opinions.  In his Revised Report, Haider lists only the depositions of Christopher Evans and Scott Kraus. [Dkt. No. 118-2, p. 2].  Haider testified he stopped reading Voth's deposition when he realized it dealt with electrical issues on the Premier jet. [Dkt. No. 60-4, p. 33].

"background material" in order to form his own independent conclusions based on his technical analysis of the data and information before him.  But Haider has done none of that.  He conceded his opinion about intermittent electrical failures was authored by counsel, not by him.  [*Id.*, pp. 115-16, 162].  He undertook no research, investigation or analysis to determine whether there were, in fact, such failures on the plane.  [*Id.*, p. 115-17].  His opinions about the defect in the plane's essential bus is based on "surmise," [*Id.*, p. 164], not expert analysis.  Indeed, Haider quit reading material about the plane's electrical system since he understood he was not the Plaintiff's expert on that subject.

> Q:     So did you – you obviously didn't read Mr. Voth's deposition before you wrote your report in this case, did you?
> A:     No.
> Q:     **And you mentioned that his deposition dealt with electrical issues.  You're – you're not claiming to be an electrical expert, are you?**
> A:     **No.**
> Q:     **All right.  So did you quit reading Mr. Voth's deposition after you realized –**
> A:     **Yes.**
> Q:     **-- that this was dealing with electrical issues?**
> A:     **Yes.**

[Dkt. No. 60-4, pp. 32-33].

He understood that John Bloomfield was "the expert in that area."  [*Id.*, p. 148-49].

Haider testified he had never been involved in the design or certification of an airplane landing gear system.  [*Id.*, p. 65].  Haider did not know whether there were Federal regulations regarding the pull force for an alternate landing

gear system. [*Id.*, p. 126]. He did not know what, if any, flight testing had been done by Beech on the alternate landing gear system. [*Id.*, p. 127]. He did not review flight test reports on the subject plane regarding testing of the alternate landing gear system [*Id.*]. His basis for the opinion that the landing gear system was improperly designed was his assumption that the gear lever had been pulled but that the main gear did not deploy. {*Id.*, p. 128]. Haider did not attend testing on the alternate landing gear system [*id.*, p. 139], and although he started to watch videos of the testing, he stopped because he "ran out of time." [*Id.*, p. 136]. Consequently, he relied only on information provided by counsel regarding the pull force used to deploy the landing gear. [*Id.*].

Haider has conceded he is not an electrical expert and not an expert in landing gear design. He relied solely on others for his opinions in this regard. He has done no testing, no investigation, no analysis as to the cause of this crash. Thus, he has no basis for the opinions he seeks to offer in those regards. These opinions lack independence and reliability and there is no data/information that Haider considered that would support them.

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Joiner*, 522 U.S. at 146.

Therefore, the only basis for these expert opinions is the ipse dixit

# IV
## CONCLUSION

The party proffering an expert bears the burden of demonstrating by a preponderance of the evidence that the expert will testify to specialized knowledge that will assist the trier of fact with reasoning and methodology that are both valid and properly applicable to the facts at issue. *See*, *e.g.*, *In re Aluminum Phosphide Antitrust Litig.*, 893 F.Supp. 1497, 1506 (D.Kan. 1995). After a review of Haider's reports and deposition testimony and argument of counsel, the undersigned concludes that many of the opinions which Haider seeks to sponsor do not meet this test.  Most of the opinions are not based on sufficient facts or data, not the product of reliable principles and methods, and are not the result of reliable application of those principles to the facts.[11]  *See*, Federal Rule of Evidence 702.  Other opinions are simply beyond the scope of Haider's announced piloting expertise.   Accordingly, I **RECOMMEND** that Haider's testimony be limited to four topics and that testimony beyond these topics be excluded:

- First, if an aircraft is functioning properly, a pilot should be able to recover from the loss of both engines in flight by following a prescribed sequence.  Aircraft are designed and manufactured in a manner that allows the pilot to restart both engines in the event they shut down simultaneously in flight.  [Dkt. No. 60-7, p. 5]

---

[11]     The Court has also considered Haider's Affidavit, submitted in support of Plaintiffs' Response to this motion.  While the Court previously recommended that this Affidavit be stricken as a Supplemental Expert Report [Dkt. Nos. 182 & 183], it has been considered here solely as evidentiary support for Plaintiffs' Response.

- Second, that pilot Caves properly followed the [South Bend airport's] Tower instructions when they directed him to do a flyaround upon observing that his main landing gear did not deploy.  [*Id.*, p. 6].

- Third, that pilots are unable to land when only the nose landing gear is deployed and the main landing gear remains retracted.  Under such circumstances, the aircraft "porpoises" during any landing attempt.  Stated differently, each time the pilot attempts to land, the nose gear touches the ground, and the dynamics force the aircraft back into the air and prevent the pilot from landing.  [*Id.*, p.7].

- Fourth, a pilot would be unable to safely land a plane if it had a defective landing gear that did not fully deploy or certain specific electrical and manufacturing defects.  [*Id.*, at p. 6-7]  These opinions should be permitted *only* if other experts and/or fact witnesses provide an adequate evidentiary foundation for Haider's independent opinion.

## **OBJECTIONS**

The District Judge assigned to this case will conduct a de novo review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned.  As part of his/her review of the record, the District Judge will consider the parties' written objections to this Report and Recommendation.  A party wishing to file objections to this Report and Recommendation must do so by Nov. 8, 2016).  *See* 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b).  The failure to file written objections to this Report and Recommendation may bar the party failing to object from appealing any of the factual or legal findings in this Report and Recommendation that are accepted or adopted by the District Court.  *See Moore v. U.S.*, 950 F.2d 656 (10th Cir. 1991); and *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).

**DATED** this 25th day of October 2016.

Paul J. Cleary
United States Magistrate Judge