**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **JAMES R. RODGERS,** *et al.***,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Case No. 15-CV-129-CVE-PJC |
| ) | |
| **BEECHCRAFT CORPORATION,** *et al.* ) | |
| ) | |
| **Defendants.** ) | |

**REPORT AND RECOMMENDATION**

Before the court is defendants' Motion in Exclude and/or Limit Testimony of Don and Colin Sommer. [Dkt. #57]. The matter has been referred to the undersigned Magistrate Judge for report and recommendation. For the reasons discussed below, the undersigned recommends that the motion be **GRANTED IN PART AND DENIED IN PART**.

**I. Background**

This lawsuit arises from the March 17, 2013, crash of a Beech Premier 390 aircraft en route from Tulsa, Oklahoma, to South Bend, Indiana. The plane was piloted by Wesley Caves and carried passengers Steve Davis, James Rodgers and Christopher Evans. During the flight, the aircraft experienced an inflight emergency caused by the accidental shutdown of both engines.[1] The pilot attempted to land the aircraft at the South Bend Airport, but was advised by Air Traffic Control that the plane's main landing gear was not extended and that Caves should exercise a standard "go around" to evaluate his landing gear extension options and make another

---

[1] The accidental shutdown of engines occurred while the pilot, Caves, was allowing his friend Steve Davis—who had a private pilot certificate with single and multi-engine land airplane and instrument airplane ratings, but no jet pilot license—to take the controls of the airplane during flight, while Caves instructed him. Upon instructions from Caves to pull the throttles out, Davis pulled the throttles all the way back, past the stops, thereby shutting down both engines. [Dkt. #108, Ex. 1, CVR Transcript at p. 33].

attempt at landing. Caves again made an unsuccessful attempt to land the aircraft and subsequently, the plane crashed just south of the South Bend airport. The pilot and Davis were killed. Passengers Rodgers and Evans were seriously injured.

The surviving passengers assert claims of negligence against Beechcraft Corporation ("Beechcraft") and Hawker Beechcraft Global Customer Support, LLC ("HGCS") and a products liability claim against Beechcraft. Their spouses, Sheryll Rodgers and Jill Evans, assert claims of loss of consortium against both defendants. Plaintiffs seek compensatory and punitive damages.

Don Sommer and his son, Colin Sommer, submitted a joint expert report on January 31, 2016. [Dkt. No. 57, Ex. 6].[2]

In the pending motion, defendants seek to exclude or alternatively limit expert testimony by Don Sommer and Colin Sommer, on the basis that the testimony fails to meet *Daubert* and Fed. R. Evid. 702 standards. Specifically, defendants contend:

- Neither of the Sommers is qualified to testify about plaintiffs' electrical failure allegations or the alternate landing gear design and related Airplane Flight Manual ("AFM") instructions. Colin Sommer is not qualified to testify regarding piloting and mechanical issues.

- Results of the pull-force testing performed by the Sommers and plaintiff's expert John Bloomfield should be excluded because the methodology of the tests is unreliable.

- Don Sommer's opinions about Caves' piloting skills and performance during the emergency should be excluded because they lack factual support.

---

[2] The reports appears to have been prepared for use in the companion case; however, the expert analysis—if proper—would be applicable in this case as well.

- The Sommers should be barred from offering what defendants characterize as "improper legal opinions," including that the aircraft had always been under the care of Hawker Beechcraft and that Hawker Beechcraft was acting as agent for Beechcraft when it made changes and repairs to the aircraft.

Plaintiffs, in response to the motion, have stated that Colin Sommer will not testify at trial, and Don Sommer will not testify regarding plaintiffs' allegations of electrical failures and their cause. [Dkt. #117 at 5, 17]. Consequently, defendants' motion is moot with respect to these issues. Plaintiffs still intend to have Don Sommer (hereafter, "Sommer") testify regarding the alternate landing gear design and AFM manual, the alternate pull force testing, the effect of electrical failures on the functionality of the aircraft and the actions that a reasonably prudent pilot might take. *Id.* They did not respond to defendants' arguments concerning improper legal opinions.

## II. Applicable Law

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

When an objection to an expert's testimony is raised, the court must perform *Daubert* gatekeeper duties before the jury is permitted to hear the evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-93 (1993); *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999). A trial court's gatekeeper duty requires two separate inquiries: (1) the witness must be qualified to offer the opinions he is espousing and (2) the proponent of the

witness bears the burden of proving by a preponderance of the evidence that its witness's opinions are both relevant and reliable. *Kumho Tire,* 526 U.S. at 141, 152. In this case, plaintiffs' *Daubert* challenges focus on the second inquiry— reliability and/or relevance.

Four nonexclusive, non-dispositive factors guide trial courts in their *Daubert* assessments of the reliability of the methodology for proffered expert testimony: (1) whether the opinion at issue can be tested; (2) whether it has been peer-reviewed; (3) the rate of known or potential error; and (4) general acceptance within the scientific community. *Daubert*, 509 U.S. at 593-94. *See also Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004). This list is not exclusive, and trial courts retain broad discretion to consider other factors. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (*citing Kumho*).

An expert's testimony may be excluded where it is based on subjective beliefs or unsupported speculation which is no more than *ipse dixit* guesswork. *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) (holding that trial court may properly exclude *ipse dixit* opinions where "there is simply too great an analytical gap between the data and the opinion proffered").

 It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist. *Dodge,* 328 F.3d at 1222. "Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 1222-23.

The second prong of the *Daubert* inquiry concerns relevancy or "fit." The trial court must conduct inquiry into whether proposed testimony is sufficiently "relevant to the task at hand."

*Bitler*, 400 F.3d at 1234 (citing *Daubert,* 509 U.S. at 597). A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact. *Id*. at 1234. "Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant 'fit.'" *Id.*

### III. Don Sommer's Qualifications

Sommer is the president and owner of Aeroscope, Inc., a company involved in forensic engineering, aircraft accident reconstruction, manufacturing disputes, computer modeling, and failure analysis of airframes, engines and aircraft systems. [Dkt. #57, Ex. 6 at 36 (Curriculum Vitae of Donald E. Sommer, P.E.)]. He earned a Bachelor of Science degree in Mechanical Engineering from University of Michigan in 1969 and did graduate work in instrumentation, testing systems and cryogenics from 1967 to 1969. *Id.* He has FAA ratings as an Airline Transport Pilot, Commercial Pilot, Certified Flight Instructor, Ground Instructor and Mechanic. *Id.* He has an FAA Inspection Authorization and Third Class FAA Medical. *Id.*

According to his Curriculum Vitae, Sommer has engineering experience in mechanical systems design and testing; hydraulic systems design and testing; mobile and fixed instrumentation; design and production of new products and sub-components, failure analysis and analysis and reconstruction of hundreds of general and commercial aviation accidents. *Id.* at 37. He is a member of the Aircraft Owners and Pilots Association; the International Society of Air Safety Investigators; the Missouri Board for Architects, professional Engineers, Professional Land Surveyors and Landscape Architects; the National Association of Flight Instructors; the

National Fire Protection Association; Cessna Jet Pilots; and the National Business Aviation Association. *Id.*

Sommer specializes in aircraft accident reconstruction; in-flight and stationary instructions systems and testing; mechanical and hydraulic systems; aircraft performance; aircraft and engine design and operation; failure analysis; interpretation of FAA regulations; pilot reactions; and pilot training. *Id.* at 38.

### IV. Analysis

**A. Sommer's Qualifications to Testify about Alternate Landing Gear and AFM**

Sommer has opined that defendants "failed to properly design and maintain the emergency landing gear system in the subject aircraft such that it failed to deploy both main landing gear on the accident flight." [Dkt. #57, Ex. 6, Sommer Report at p. 30, ¶ 10]. Additionally, during his deposition, Sommer opined that the Airplane Flight Manual ("AFM") should instruct as to "either, one, the distance they are to pull that handle, or number two, the force that they should expect," "either that, or there should be a marker on the handle that tells you how far to pull it." [*Id.*, Ex. 7, Sommer Dep., 246:13-247:7]. Defendants contend Sommer is not qualified by education, training, knowledge or experience to testify about landing gear design or the instructions for pilots on deployment of landing gear.

Sommer admitted in his deposition that he has never designed an aircraft, nor has he designed landing gear or an alternative landing gear extension system for an airplane. [*Id.*, 33:10-11; 34:23-37:18]. He has never designed or performed maintenance on a Premier, Model 390. [*Id.*, 57:22-58:2]. However, he considers himself "very knowledgeable" about designing general aviation aircraft because he analyzes, consults and comments about designs, is a mechanical engineer and has been in the aircraft industry for forty years. [*Id.*, 46:6-13]. He

6

testified that ninety to ninety-five percent of his company's consulting work is litigation-related and ninety-five percent of that work is on behalf of plaintiffs. [*Id.*, 24:11-25:3].[3] Sommer has no training or experience in design of landing gear or alternative landing gear extension systems for airplanes. Therefore the undersigned concludes that he is not qualified to testify about alternative landing gear design.

However, Sommer's experience as a mechanical engineer, pilot and flight instructor qualifies him to opine about the adequacy of the AFM instructions. According to his Curriculum Vitae, Sommer has more than 16,000 hours of piloting time. [Dkt. #57, Ex. 6, p. 34]. He has operated emergency landing gear systems on numerous occasions in many different types of aircraft both in real emergency situations and for training purposes, has trained pilots to operate emergency landing gear systems in many types of aircraft and has serviced, maintained and overhauled emergency gear systems. [Dkt. #117, Ex. 6, ¶¶ 9-10].[4] Accordingly, the undersigned concludes Sommer is qualified to testify about the adequacy of the AFM instructions.

### B. Pull Force Testing

Sommer and Bloomfield conducted pull force testing to determine the amount of force needed to deploy the Premier's alternate landing gear. Based on this, Sommer opined in his report that defendants "failed to properly design and maintain the emergency landing gear system in the subject aircraft such that it failed to deploy both main gear on the accident flight"

---

[3] In *Laugelle v. Bell Helicopter Textron, Inc.*, 2014 Del. Super. LEXIS 508 at **22-23 (Del. Super. 2014), the court ruled that Sommer was not qualified to testify that an alternate design of the power turbine governor in a helicopter could have prevented the crash of the helicopter. In so ruling, the court stated, "Although a mechanical engineer with extensive piloting experience, including an FAA rating as an "Airframe" mechanic, Mr. Sommer possess no training or experience in aircraft component design relevant to this case." *Id.* at *23.

[4] While the Court previously recommended that this Affidavit be stricken as a Supplemental Expert Report [Dkt. ##182-183], it has been considered here solely as evidentiary support for Plaintiffs' Response.

7

and "failed to warn the owners, operators and maintainers of the aircraft of the extremely large pull forces required as well as the sequential nature of the emergency landing gear system." [Dkt. #57, Ex. 6 at pp. 30-31].

Defendants assert Sommer should be barred from expressing these opinions at trial because the experts' testing methodology was flawed. Specifically, defendants contend: (1) the testing was not conducted in accordance with the aircraft's maintenance manual;[5] (2) both experts mistakenly believed that the specifications for the alternate landing gear extension system called for the nose gear to drop with twenty-five pounds pull force, while in reality, the test procedure requires that the pull force be less than sixty pounds;[6] and (3) Sommer mistakenly

---

[5] The Premier's Maintenance Manual contains instructions, with pictures, for measuring the pull force. [Dkt. #57, Ex. 12, Test Procedure at § 5.5.16; Ex. 13, Maintenance Manual at BC24776, BC24791-92]. Specifically, a bridle is to be attached around both sides of the t-shaped pull handle, and a force gauge is attached to the bridle. *Id.* In conducting their pull force testing, Sommer and Bloomfield did not use a bridle placed around both sides of the handle, but instead attached the force gauge to one side of the handle, using a hook. [Dkt. #57, Ex. 7, D. Sommer Dep. at 201:24-202:17; Ex. 14, Bloomfield Dep. at 296:6-21]. Sommer testified he and Bloomfield "may have" had a discussion about using a bridle per the maintenance manual but that both believed "it makes absolutely no difference" whether a bridle or a hook was used for the test because the hook "puts very, very little side force on the cable, but the primary reason is because the force that's on this handle doesn't come from the handle. It comes from the cable that goes through the various places in the airplanes." [*Id.*, Sommer Dep. at 203:1-204:3]. When asked whether putting a hook around one side of the T-handle could induce side loads, Sommer responded, "Yes, insignificant side loads can be induced." [*Id.* at 204:11-19]. Sommer testified the pull should be along the centerline of the handle, and a non-linear pull could "theoretically" induce higher loads. [*Id.* at 205:24-206:5]. He admitted he had not measured what the pull angle was on the test performed by Mr. Bloomfield, but stated that "[i]t wouldn't affect me one way or the other" if the pull angle on the test performed by Bloomfield was 22 degrees negative. [*Id.* at 206:6-14]. Sommer admitted he never tried following the Maintenance Manual's procedures to compare its result to the approach he and Bloomfield used, but opined that the Maintenance Manual protocol "is significantly less accurate than the way we did it." [*Id.* at 204:20-205:2]. However, under the direction of defendants' experts, Beech personnel replicated the high pull force results obtained by plaintiffs experts on an exemplar Premier by pulling the alternate landing gear handle at an off-axis angle. [*Id.*, Ex. 15, Winn Supplemental Report, p. 2].

[6] The Test Procedures for the Premier provide that the maximum handle force for the emergency gear down handle should be less than sixty pounds in production and sixty-four pounds in

8

relied on the procedure and testing for adjusting the alternate landing gear handle cables instead of on the procedure for testing maximum pull force for deploying the alternate landing gear system. Additionally, they argue Sommer's opinion on pull force testing should be barred because he admitted in his deposition that during the testing of one of the Premiers he and others involved in the testing were wagering about how much force would be required before the gear would release. [Dkt. #57, Ex. 7, Sommer Dep. at 221:29-223:14].

In his expert report, Sommer stated that his test methodology was based in part on the guidelines established by the International Civil Aviation Organization ("ICAO") in its Manual of Aircraft Accident and Incident Investigation and that all of his methods of investigation and of forming opinions were consistent with well accepted procedures in the ICAO manual. [Dkt. #57, Ex. 6 at p. 29]. Additionally, he followed procedures outlined in the United States Air Force Guide to Mishap Investigation, the United States Navy Handbook for Aircraft Accident Investigation, the National Transportation Safety Board ("NTSB") Major Investigation Manual, the Transport Safety Board of Canada Investigations Manual and the University of Southern California Manual of Aircraft Accident Investigation. [*Id.* at pp. 29-30]. He conducted tests of the alternate gear extension system on three different exemplar aircraft. [*Id.* at p. 28]. Plaintiffs contend the Sommer/Bloomfield pull force test was the "best test possible to test the pull force required on the Premier" because three separate Premier aircraft in three separate states were tested, thus eliminating the possibility that the findings on any one aircraft were an anomaly and ensuring the least possible margin for error in the test. [Dkt. #117 at 18].[7]

---

maintenance. [Dkt. #57, Ex. 12, Test Procedure at § 5.5.16; Ex. 13, Maintenance Manual at BC24776, BC24791-92].

[7] Sommer also stated in his affidavit that he had performed lab testing of his test apparatus with an exemplar "T" handle to verify the methodology was accurate and repeatable and concluded from the testing that "there is no material or statistically significant difference in the pull force measured using a single versus a double hook around the T-handle." [Dkt. #117, Ex. 6, ¶ 21].

> The Tenth Circuit has held that in order to establish an expert's testimony as reliable:
>
> The plaintiff need not prove that the expert is undisputably correct or that the experts' theory is "generally accepted" in the scientific community. Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements.

*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). Further, "[w]hen examining an expert's method, . . . the inquiry should not be aimed at 'the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.'" *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) (quoting *Daubert*, 509 U.S. at 597).

Fed. R. Evid. 702(b) requires the expert's opinion to be based on "sufficient facts and data." The Tenth Circuit has held that *Daubert* does not govern this issue because, "[b]y its terms, the *Daubert* opinion applies only to the *qualifications of an expert and the methodology or reasoning used* to render an expert opinion" and "generally does not . . . regulate the underlying facts or data that an expert relies on when forming her opinion." *United States v. Lauder*, 409 F.3d 1254, 1264 (10th Cir. 2005) (emphasis added). In assessing the sufficiency of the facts, the trial court should conduct "a quantitative rather than qualitative analysis." Fed. R. Evid. 702 Advisory Committee Note to 2000 Amendments. As another district court has held, "the Court does not examine whether the facts obtained by the witness are themselves reliable—whether the facts used are qualitatively reliable is a question of the *weight* to be given the opinion by the factfinder, not the *admissibility* of the opinion." *United States v. Crabbe*, 556 F. Supp.2d 1217, 1223 (D. Colo. 2008) (emphasis in original). Accordingly, the trial court should limit its inquiry under Rule 702(b) to "whether the witness obtained the amount of data that the methodology itself demands." *Id.*

---

The undersigned has recommended defendants' Motion to Strike [Dkt. #150] be granted with respect to this paragraph. [Dkt. #182 at 15-17].

Defendants' complaints about Sommer's pull force testing go to the weight his opinions should be accorded, rather than the admissibility of the opinions.  A properly instructed jury should be permitted to decide the weight it will give his opinions.  Therefore, the undersigned recommends that defendants' motion to exclude the results of Sommer's pull force testing be denied.

### C. Opinions Regarding Caves' Piloting Performance

In his expert report, Sommer opined that the pilot "was trained, qualified, experienced and capable of performing the subject mission," "had taken all the steps to be expected by a prudent and reasonable pilot to ensure that the subject aircraft was mechanically sound and airworthy prior to departure," and "operated the subject aircraft within the bounds of the operation limitations and guidance spelled out in the Beechcraft Premier 1A Pilot's Operating Manual" and "there is no reason that the aircraft could not have been landed safely except for the electrical system failure that occurred."  [Dkt. #57, Ex. 6, ¶¶ 1-3].[8]  Defendants assert these opinions are not supported by sufficient facts or data, as required by Rule 702.

The party proffering an expert bears the burden of demonstrating by a preponderance of the evidence that the expert will testify to specialized knowledge that will assist the trier of fact with reasoning and methodology that are both valid and properly applicable to the facts at issue. *See*, *e.g.*, *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp1497, 1506 (D. Kan. 1995).  After a review of Sommer's report, deposition testimony and argument of counsel, the undersigned concludes his opinions on Caves' piloting performance do not meet this test because they are not based on sufficient facts or data.  Specifically, with respect to Sommer's opinion that Caves was trained, qualified, experienced and capable of performing the subject mission,

---

[8] As previously noted, plaintiffs have stated they will not call Sommer to testify regarding alleged electrical failure issues.

11

Sommer admitted he did not contact anyone from the Jetstream Company, where Caves received his Premier training. [Dkt. #57, Ex. 7, Sommer Dep. at 90:18-91:17]. He had no knowledge of whether Caves, during training at Jetstream, ever practiced an extension of the alternate gear system on the Premier, and he conducted no investigation to determine what kind of training Caves received in actually deploying the alternate gear landing. [*Id.* at 92:19-93:7]. He admitted he had no evidence that Caves was trained in how to use the alternate landing gear handle. [*Id.* at 224:18-225:22], [*Id.* at 92]. Likewise, he had no evidence Caves ever practiced a dual engine failure or shutdown. [*Id.* at 94:21-25]. He was aware of testimony that Caves had trouble following checklists and had a tendency to flip the wrong switches in the wrong order, i.e. "switchology" problems. [*Id.* at 89:21-90:12].

Concerning Sommer's opinion that Caves "operated the subject aircraft within the bounds of the operation limitations and guidance spelled out in the Beechcraft Premier 1A Pilot's Operating Manual," it is undisputed that Caves allowed a non-current pilot passenger who was not rated to fly a jet airplane to operate the throttles at a low altitude, resulting in the passenger shutting down the engines mid-flight—a maneuver Sommer admitted he "wouldn't recommend." [Ex. 2, NTSB Factual Report at p. 1c; Ex. 7, Sommer Dep. at 93:22-94:20]. The NTSB's CVR transcript indicates that the Premier's overspeed warning signal sounded twice during the period of time the CVR was recording, showing that the aircraft was exceeding the specified air speed. [Ex. 1, NTSB Group Chairman's Factual Report of Investigation at pp. 15, 25]. The CVR transcript further reflects Caves statement that even though the manual specified the landing gear was engineered for a thirteen thousand pound landing weight, "I don't pay a whole lot of attention to it" and "I don't have any problem with thirteen and a half thousand [pounds]." [*Id.*,

12

pp. 11-12]. And Sommer admitted, "We don't have proof of what Mr. Caves did after the CVR failed." [Ex. 7, Sommer Dep. at 234:15-22].

These facts completely undermine Sommer's opinions concerning the Caves' training and performance in piloting the aircraft. Accordingly, the undersigned recommends that defendants' motion to exclude these opinions be granted.

### D. Legal Opinions

Defendants ask the Court to exclude two opinions they characterize as "improper legal opinions:" first, that "[t]he accident aircraft had always been under the care of Hawker Beechcraft," and second, that "Hawker Beechcraft Services was acting as agent for Beechcraft when it make those changes/repairs [for warranty work]." [Dkt. #57, Ex. 6, Sommer Expert Report, ¶¶ 13, 17]. Plaintiffs, in their response, did not address this issue.

Sommer is a mechanical engineer and pilot. He is not an attorney and has no particular legal expertise. Therefore, the opinions proffered in Paragraphs 13 and 17 should not be admitted.

### E. Uncontroverted Facts

Defendants ask the Court to bar Sommer from testifying to the following undisputed facts: (1) that "the weather was checked and weather was not a causal factor to the crash;" (2) "pulling back of both power levers behind the gate resulted in a dual engine shutdown on the accident flight;" (3) the right wing was damaged on the landing attempt during the second go-round; and (4) the pilot lost aerodynamic control on the attempted take-off and could not recover. Plaintiffs did not address this issue. Expert testimony is permitted under Rule 702 when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Since these facts are uncontested, the undersigned recommends that these opinions be excluded.

## V. Conclusion

The party proffering an expert bears the burden of demonstrating by a preponderance of the evidence that the expert will testify to specialized knowledge that will assist the trier of fact with reasoning and methodology that are both valid and properly applicable to the facts at issue. *See*, *e.g.*, *In re Aluminum Phosphide Antitrust Litig.*, 893 F.Supp. 1497, 1506 (D.Kan. 1995). After a review of Sommer's report and deposition testimony and argument of counsel, the undersigned concludes that a number of his opinions are not based on sufficient facts or data, not the product of reliable principles and methods, and not the result of reliable application of those principles to the facts. *See*, Federal Rule of Evidence 702. Other opinions are simply beyond the scope of Sommer's expertise. Accordingly, I **RECOMMEND** that Sommer be precluded from testifying:

- that defendants "failed to properly design and maintain the emergency landing gear system in the subject aircraft such that it failed to deploy both main landing gear on the accident flight." [Dkt. #57, Ex. 6, Sommer Report, ¶ 10].

- that the pilot "was trained, qualified, experienced and capable of performing the subject mission," "had taken all the steps to be expected by a prudent and reasonable pilot to ensure that the subject aircraft was mechanically sound and airworthy prior to departure," and "operated the subject aircraft within the bounds of the operation limitations and guidance spelled out in the Beechcraft Premier 1A Pilot's Operating Manual" and "there is no reason that the aircraft could not have been landed safely except for the electrical system failure that occurred." [*Id.*, ¶¶ 1-3, 9].

- about the results of testing of his pull test apparatus performed subsequent to his Expert Report and deposition. [Dkt. # 117, Ex. 6, ¶ 21].

- that "[t]he accident aircraft had always been under the care of Hawker Beechcraft, and second, that "Hawker Beechcraft Services was acting as agent for Beechcraft when it make those changes/repairs [for warranty work]." [Dkt. #57, Ex. 6, Sommer Affid., ¶¶ 13, 17].

- that "the weather was checked and weather was not a causal factor to the crash;" (2) "pulling back of both power levers behind the gate resulted in a dual engine shutdown on the accident flight;" (3) the right wing was damaged on the landing attempt during the

second go-round; and (4) the pilot lost aerodynamic control on the attempted take-off and could not recover. [*Id.*, ¶¶ 2, 18, 40].

The undersigned **FURTHER RECOMMEND** that Sommer be permitted to testify as to the results of the pull test reported in his Expert Report and his criticisms of the AFM manual.

## **OBJECTIONS**

The District Judge assigned to this case will conduct a de novo review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned. As part of his/her review of the record, the District Judge will consider the parties' written objections to this Report and Recommendation. A party wishing to file objections to this Report and Recommendation must do so by **December 13, 2016**. *See* 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b). The failure to file written objections to this Report and Recommendation may bar the party failing to object from appealing any of the factual or legal findings in this Report and Recommendation that are accepted or adopted by the District Court. *See Moore v. U.S.*, 950 F.2d 656 (10th Cir. 1991); and *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).

**DATED** this 29th day of November, 2016.

Paul J. Cleary
United States Magistrate Judge